[Cite as *State v. Alexander*, 2013-Ohio-2533.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98941**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# REGINA ALEXANDER

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-557694

**BEFORE:** Keough, J., Jones, P.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** June 20, 2013

**ATTORNEY FOR APPELLANT**

Richard Agopian
The Hilliard Building
1415 West 9th Street, 2nd Floor
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By: Adrienne E. Linnick
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, Regina Alexander, appeals from the judgment of the common pleas court, rendered after a jury verdict, finding her guilty of aggravated robbery and felonious assault. Finding no merit to the appeal, we affirm.

I. Background

{¶2} Alexander was indicted in a multi-count indictment on two counts of aggravated robbery, in violation of R.C. 2911.01(A)(1) and (A)(3); two counts of felonious assault, in violation of R.C. 2903.11(A)(1) and (A)(2); improperly handling firearms in a motor vehicle, in violation of R.C. 2923.16(B); and carrying a concealed weapon, in violation of R.C. 2923.12(A)(2). The aggravated robbery and felonious assault charges included one- and three-year firearm specifications; the other two counts included forfeiture specifications regarding a firearm and ammunition and were bifurcated prior to trial.

{¶3} At trial, the victim, Gary Goins, testified that he met Alexander on Facebook and began communicating with her. Goins said that one day Alexander suggested they meet up for sex and told him it would cost $100. At her request, Goins gave Alexander his telephone number. He said she then called him approximately 25 times over the course of several hours, although he only answered and spoke with her three times. Goins said that in the first conversation, which occurred at approximately 9:30 p.m., Alexander suggested they meet at East 99th Street and St. Clair Avenue, to which Goins agreed. Alexander then called Goins repeatedly over the next half hour;

when he finally answered, she asked him where he was and told him that she was at the meeting place. Finally, at approximately 1 a.m., Goins answered another call from Alexander and told her that he was on his way.

{¶4} Goins said that he stayed on the phone with Alexander as he drove to the meeting place and that as he pulled up, Alexander asked him what kind of vehicle he was driving. When Goins confirmed that he was in a 1999 Ford Explorer, Alexander told him to pull over by the stop sign, which was under a street light. Goins testified that after he stopped as instructed, Alexander walked to the truck and told him to get out. When he did, she asked him whether he had a gun. When Goins looked at her quizzically, Alexander asked him again if he had a gun. Goins said that when he told Alexander that he did not carry a gun, she asked him a third time, in a loud voice, if he had a gun. Goins told Alexander that she was "trippin" and began walking back toward his truck. As he was about to get in, he saw a light-skinned black man with a square-shaped head walk up to the front of his truck, cock a gun, and point it at him. Goins testified that Alexander did not walk away when she saw the man with the gun.

{¶5} Goins said that he immediately understood that he had been set up to be robbed. The male repeatedly told Goins to "lay it down," and when Goins told the male that he was not going to give him anything, the male pointed the gun at Goins's feet. Goins said that he started backing away from the male and then turned and ran away. Goins testified that the male chased him and then shot him in the back of his neck. Goins was able to run to safety and call 911 on his cell phone. As he was calling 911, he

flagged down several Cleveland police detectives who were driving by and gave them a description of Alexander and the shooter. Goins was then taken by ambulance to the hospital, where he stayed for three weeks.

{¶6} After he was released from the hospital, Goins met with a Cleveland police detective, showed him Alexander's picture from her Facebook page, and told him that she had set him up to be robbed. A short time later, Goins noticed that Alexander's Facebook page had been deleted.

{¶7} Goins testified that several months later, he was at a medical clinic when he saw Alexander and the male who had tried to rob him. Goins alerted security, who called the police. When the police arrived, they questioned Alexander and the male. Later that evening, Goins positively identified Alexander and her companion, Joseph Mason, from photo lineups.

{¶8} The jury found Alexander guilty of both counts of aggravated robbery and both counts of felonious assault and not guilty of all firearm specifications. She subsequently pled guilty to carrying a concealed weapon and the State dismissed the improper handling of a firearm charge. The trial court then sentenced Alexander to an aggregate term of three years incarceration.

## II. Analysis

A. Sufficiency and Manifest Weight of the Evidence

{¶9} In her first and second assignments of error, Alexander contends that her convictions for aggravated robbery and felonious assault were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶10} Crim.R. 29(A) provides for a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶11} A manifest weight challenge, on the other hand, questions whether the prosecution met its burden of persuasion. *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). The manifest-weight-of-the-evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact "lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against

the convictions. *Id.* A finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *Id.* at 388.

**{¶12}** Alexander was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1) and (A)(3), which provide that

> [n]o person, in attempting or committing a theft offense * * * shall * * * (1) have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or will use it; * * * (3) inflict, or attempt to inflict, serious physical harm on another.

**{¶13}** She was also convicted of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2), which provide that "[n]o person shall knowingly * * * (1) cause serious physical harm to another * * *; (2) cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

**{¶14}** The State's theory at trial was that Alexander aided and abetted Mason in the commission of the robbery. Ohio's complicity statute, R.C. 2923.03(A), provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense." "A person aids or abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Bailey*, 8th Dist. No. 97329, 2012-Ohio-3447, ¶ 20, citing *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796. "[A]n unarmed accomplice can be convicted of an underlying felony, together with a firearm specification, based on an aider

and abettor status." *State v. Porch*, 8th Dist. No. 65348, 1994 Ohio App. LEXIS 1936 (May 5, 1994), citing *State v. Chapman*, 21 Ohio St.3d 41, 487 N.E.2d 566 (1986).

{¶15} Alexander contends that her convictions were not supported by sufficient evidence because there was no evidence to show that she was complicit in the robbery by Mason. She contends that the jury simply speculated that she was involved after they learned that Mason was her boyfriend. Alexander's argument is without merit.

{¶16} Goins's testimony demonstrated that Alexander (1) suggested the face-to-face meeting; (2) told Goins he needed $100 to "date" her to ensure that he would have cash on his person; (3) picked the secluded meeting location; (4) placed approximately 25 telephone calls to confirm the meeting; (5) told Goins exactly where to stop his vehicle when he arrived at the meeting location; (6) told him to get out of the car; and (7) asked him three times if he had a gun — the third time very loudly to signal her accomplice. This testimony alone, if believed, is sufficient to demonstrate that Alexander aided and abetted Mason by setting in motion the series of events that culminated in the robbery and felonious assault.

{¶17} With respect to the manifest weight of the evidence, Alexander contends that in light of Goins's prior felony conviction, the jury should have found his testimony not credible. But while a reviewing court considers the credibility of the witnesses in a weight-of-the-evidence review, "that review must nevertheless be tempered by the principle that weight and credibility are primarily for the trier of fact" because it is in "the best position to view the witnesses and observe their demeanor, gestures, and voice

inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Kash*, 1st Dist. No. CA2002-10-247, 2004-Ohio-415, ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Here, the jury heard testimony regarding Goins's prior criminal conviction and still found his testimony credible. We find nothing in the record to suggest this created such a manifest miscarriage of justice that the conviction must be reversed.

{¶18} Alexander also argues that the jury lost its way in convicting her because there was "a complete absence of proof, and, other than the victim's speculation, no evidence" that she was involved in the robbery. She contends that due to this lack of proof, and because it is "normal" for a women to ask a man she is meeting for sex whether he has a gun, the jury should have concluded that Mason was simply a jealous boyfriend who learned of the sex-for-money idea and came to the scene to confront Goins. She argues further that the jury lost its way because they convicted her despite testimony that the Cleveland police did not strictly comply with statutory procedure when they showed Goins the photo arrays from which he identified her and Mason (see further discussion about the photo arrays in the analysis of the fourth assignment of error below).

{¶19} Despite Alexander's arguments, this is not the exceptional case where the evidence weighs heavily against the conviction. As discussed above, the evidence of Alexander's participation and planning in the events that culminated in the robbery and felonious assault was overwhelming. And Alexander's argument regarding the defective photo array procedure ignores Goins's unequivocal identification of her and Mason at the

medical clinic and at trial, as well as the court's instruction that the jury should take into account the failure by the police to follow statutory identification procedure when considering the reliability of Goins's eyewitness identification.

{¶20} After reviewing the entire record, weighing the evidence, evaluating the credibility of the witnesses, and resolving any conflicts in the evidence, we find that the jury did not lose its way or create a manifest miscarriage of justice in finding Alexander guilty of aggravated robbery and felonious assault. The first and second assignments of error are therefore overruled.

B.    Motion to Suppress

{¶21} For clarity, we consider the third and fourth assignments of error out of order.

{¶22} In her fourth assignment of error, Alexander contends that the trial court erred in denying her motion to suppress Goins's pretrial identification of her from a photo array.

{¶23} A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71. Consequently, we give deference to the trial judge's factual findings but review the application of law to fact de novo. *Id.*

{¶24} Alexander first contends that the court should have granted her motion to suppress because the police did not comply with the requirements of R.C. 2933.83(B) when showing Goins the photo array.

**{¶25}** R.C. 2933.83(B) took effect in July 2010. The statute requires any law enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt specific procedures for conducting the lineups. *State v. Ruff*, 1st Dist. No. C-110250, 2012-Ohio-1910, ¶ 5. The procedures include the use of "a blind or blinded administrator"[1] to conduct a live or photo lineup and a written record of the lineup that includes all results obtained during the lineup, the names of all persons at the lineup, the date and time of the lineup, and the sources of the photographs used in the lineup. Further, if a blind administrator is used, the administrator is required to inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know who the suspect is.

**{¶26}** Our review of the record of the suppression hearing indicates that the police did not comply with the requirements of R.C. 2933.83(B). For example, the police could not confirm that Goins was advised that the suspect may or may not be in the photo array, and the police did not document the date and time of the lineup, who was present, or the identity and source of the photographs used in the photo array.

**{¶27}** Under R.C. 2933.83(C)(1), evidence of a failure to comply with the required protocol "shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup." "R.C. 2933.83(C)(1), however, does not provide an independent basis upon which to suppress evidence, and a

---

[1] A blind administrator is an administrator who does not know the identity of the suspect; a blinded administrator is one who may know who the suspect is but does not know which lineup member is being viewed by the eyewitness.

trial court errs in solely relying on the statute in suppressing an identification." *State v. Sails*, 2d Dist. No. 24733, 2012-Ohio-4453, ¶ 30. Rather, the "penalty" for failure to comply with R.C. 2933.83 is that "the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification." *Id.* at ¶ 31; R.C. 2933.83(C)(3).

**{¶28}** Here, the trial court instructed the jury regarding R.C. 2933.83 as follows:

> The court further instructs you that the Ohio Revised Code imposes certain requirements upon the police when photo arrays are shown to a witness. This court has found that the Cleveland police department did not fully comply with the law when it displayed photo arrays to Mr. Goins.

> When there is evidence of a failure to comply with any of the provisions of the law, the law provides that you, as jurors, may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification resulting from or relating to the photo array.

Accordingly, the jury was properly instructed that it could consider credible evidence of noncompliance with R.C. 2933.83 in evaluating whether Goins's identification of Alexander and Mason from the photo arrays was reliable eyewitness identification.

**{¶29}** Alexander also argues that the trial court erred in denying her motion to suppress because Goins's photo array identification of her was unreliable. She makes no argument regarding why it was allegedly unreliable other than asserting that the police did not follow the requirements of R.C. 2933.38.

**{¶30}** Our review of the transcript of the suppression hearing demonstrates that the State presented evidence that Goins gave Cleveland police detectives a description of Alexander and Mason on the night of the robbery and shooting. Subsequently, he

showed detectives Alexander's Facebook photo. Then, several months later, he saw Alexander and Mason at a medical clinic and immediately recognized them as the individuals involved in the robbery and shooting. He called security, who called the police, who obtained information from Alexander and Mason when they arrived at the scene. Using this information, the police created two photo arrays, one containing males with a likeness to Mason; the other containing females with a likeness to Alexander.

{¶31} The police then asked Goins to come to the station, where he was shown the photo arrays. Goins testified that he was asked to circle, sign, and date the array if he recognized anyone. He said that he recognized Alexander as the female who set him up and Mason as the shooter and testified that he was 100 percent sure of his identification.

{¶32} Goins also testified at the suppression hearing about his opportunities to observe Alexander prior to identifying her from the photo array. He testified that on the night of the incident, he stopped his truck under a streetlight and was only a few feet away from Alexander as they talked. He also testified that he saw her picture on Facebook before and after the robbery, and that he immediately recognized her months later at the clinic as the woman who had set him up.

{¶33} Viewing the photo array identification under the totality of the circumstances, it is apparent the identification was reliable, despite the failure of the police to fully comply with R.C. 2933.83, and the trial court did not err in denying Alexander's motion to suppress. The fourth assignment of error is therefore overruled.

C.    Prosecutorial Misconduct

**{¶34}** In her third assignment of error, Alexander contends that prosecutorial misconduct during the State's closing argument deprived her of her constitutional right to a fair trial. Specifically, Alexander contends that the prosecutor's question, "What difference does it make if the procedure was followed exactly with the photo lineup?" during closing argument was "a blatant attempt to inflame the passion of the jury" and thus deprived her of a fair trial.

> The test for prosecutorial misconduct is whether remarks are improper and, if so, whether they prejudicially affected substantial rights of the accused. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial. Thus, an appellate court must examine the entire statement to determine whether the result of the proceedings would have been different had the prosecutor not made the remarks at issue. (Citations omitted.)

*State v. Bailey*, 8th Dist. No. 97329, 2012-Ohio-3447, ¶ 12.

**{¶35}** We find that the prosecutor's question fails to satisfy the above standard. The prosecutor stated:

> And eventually our victim runs into these same two that robbed him at a clinic. Based on that he gets some photo lineups that the police showed to our victim. Did they do it exactly right? No.
>
> But ask yourself, really does that matter? I mean, you saw our victim in here testifying. You were able to look at him. Look him in the eye. Look at how he was acting. You saw him.
>
> There is no doubt in his mind that this is the person that set this up. This is the person that robbed him, and her boyfriend. There is zero doubt. He is 100 percent certain.
>
> What difference does it make if the procedure was followed exactly with the photo lineup? And remember, this is right after he identified him in the clinic anyway.

{¶36} Our review of the State's question, viewed in context, demonstrates that the prosecutor was arguing that even if the police did not handle the photo array "exactly right," in light of Goins's unequivocal testimony about what had happened, and the fact that he had immediately recognized Alexander and Mason at the clinic some months after the robbery and shooting, the jury could rely on his testimony that Alexander was the perpetrator. The prosecutor's comments were not improper and the result of the trial would not have been different had the prosecutor not made them. The third assignment of error is therefore overruled.

{¶37} Affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the common pleas court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, JUDGE

LARRY A. JONES, SR., P.J., and
EILEEN A. GALLAGHER, J., CONCUR